IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Textileather Corporation,   Case No. 3:08 CV 171

                 Plaintiff,   MEMORANDUM OPINION
                            AND ORDER

    -vs-

                                  JUDGE JACK ZOUHARY

GenCorp Inc.,

                 Defendant.

## INTRODUCTION

Plaintiff Textileather Corporation ("Textileather") filed this lawsuit seeking to recover from Defendant GenCorp Inc. ("GenCorp") expenses incurred in attempting to close hazardous waste units at a manufacturing facility in Toledo, Ohio (Doc. No. 1, ¶¶ 23-25). After this Court dismissed two claims from the Complaint (Doc. No. 19), three claims remain alleging breach of contract and seeking relief under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA").

This matter is before the Court on cross-Motions for Summary Judgment (Doc. Nos. 72 & 75). Both parties filed oppositions (Doc. Nos. 85 & 86), and the Court held a hearing on March 12, 2010 (Doc. No. 97). For the following reasons, GenCorp's Motion is granted, and Textileather's Motion is denied.

## BACKGROUND

The underlying facts of this case are not in dispute, and both parties agree the case is appropriate for summary judgment (Hearing Transcript ("TR") pp. 27-29). From the mid-1950s to 1990, GenCorp or related entities owned a vinyl manufacturing facility on Twining Road in Toledo ("Facility"). In 1989 the Facility's employees established the Toledo Buy-Out Committee to

negotiate the purchase of the Facility from GenCorp. The Committee created a new company, Textileather, to purchase the Facility. The parties signed an Asset Purchase Agreement ("APA") on May 30, 1990, and Textileather became the owner of the Facility on June 4, 1990 when the deal closed ("Closing").

The environmental condition of the Facility was an issue during the buy-out negotiations. Textileather and GenCorp included detailed provisions in the APA to allocate environmental liabilities. GenCorp agreed that it would retain specifically designated environmental liabilities for certain identified chemicals and locations, and also would defend and indemnify Textileather for claims involving retained liabilities. Textileather assumed all business-related environmental liabilities not retained by GenCorp.

Much of the environmental concern arose from GenCorp's operation of hazardous waste management units ("RCRA units") at the Facility. These RCRA units reclaimed solvent waste. Under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("RCRA"), GenCorp was obligated to obtain RCRA Part A and Part B permits to operate the RCRA units. As of the Closing, GenCorp had applied for but not yet received a RCRA Part B permit. In the APA, GenCorp agreed to pay, subject to a limit of $250,000, for those activities necessary to complete the process of obtaining the Part B permit. After the Closing, Textileather continued to pursue the Part B permit and to operate the RCRA units. But in December 1990, Textileather decided to shut down the units.

This decision to stop operating the RCRA units triggered a regulatory obligation to submit a closure plan to be approved by the Ohio Environmental Protection Agency ("OEPA"). OEPA refused to approve Textileather's plan, and required Textileather to "submit a modified closure plan addressing the deficiencies of its previously submitted plan." *Textileather Corp. v. Korleski*, 2007 WL 2306968, *3 (Ohio Ct. App. 2007). Over the next ten years, Textileather and the OEPA

2

negotiated a revised plan, but were unable to agree. Finally, in November 2001, OEPA approved a closure plan, but Textileather disagreed with many aspects of the plan and appealed it to the Environmental Review Appeals Commission, and then to the Ohio Tenth District Court of Appeals, which affirmed in part and reversed in part. The court of appeals remanded the matter to the OEPA with instructions to approve yet another plan consistent with the court's holdings. OEPA has yet to approve a new closure plan.

Textileather incurred costs during its protracted negotiations and litigation with the OEPA.[1] Textileather filed this suit against GenCorp seeking to recover, under both the APA's indemnity provisions and costs incurred in attempting to fulfill its regulatory obligation to close the RCRA units.

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains

---

[1]

Significant questions exist regarding whether Textileather has incurred any actual damages related to the closure plan. Textileather never provided documentation that it has paid any of these alleged costs. GenCorp raised this issue in briefing, and again at the hearing, yet Textileather continually fails to respond (TR 16-17). This Court need not decide the issue given its ruling on other grounds.

Likewise, this Court expresses no opinion as to whether GenCorp's retained liabilities terminate on June 4, 2010 pursuant to Section 9.1.6(a) ("Seller's Retained Liabilities . . . and Indemnification . . . will terminate 20 years after the Closing."). The question of termination is not a ripe controversy before this Court and, even were it ripe, it would now be mooted by this Opinion granting GenCorp summary judgment.

sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)

The summary judgment standard does not change simply because the parties present cross-motions. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The fact that both parties move for summary judgment does not mean the court must grant judgment as a matter of law for one side or the other; rather, the "court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* As outlined above, the material facts are not in dispute in the instant case, making it well suited for summary judgment. *See Havensure, LLC v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 315 (6th Cir. 2010); Federal Civil Rule 56(c)(2).

## BREACH OF CONTRACT CLAIMS

### Standards for Contract Interpretation

The APA is governed by Ohio law (APA, Section 11.3). Construction and interpretation of a written contract are questions of law. *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996). "The purpose of contract construction is to discover and effectuate the intent of the parties," and "the intent of the parties is presumed to reside in the language they chose to use in their agreement." *Id.* Extrinsic evidence is admissible to ascertain intent only when the contract terms are unclear or ambiguous. *Id.* at 314. The court reads the contract as a whole, and gathers the intent of each party from a consideration of the whole. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Authority*, 78 Ohio St. 3d 353, 361 (1997).

GenCorp correctly argues that, under the plain language of the APA, it did not retain the liabilities at issue in this case (TR 12-14). The contract language is clear and unambiguous.

4

Therefore, interpretation of the contract terms is a question of law, and extrinsic evidence is unnecessary. *See Graham*, 76 Ohio St. 3d at 313; *Kellie Auto Sales, Inc. v. Rahbars & Ritters Enters., LLC*, 172 Ohio App. 3d 675, 682-83 (2007) ("If the contract is clear and unambiguous, its interpretation is a matter of law, and there is no issue of fact to determine. However, where the contract language is reasonably susceptible of more than one interpretation, the meaning of the ambiguous language is a question of fact.").

**The APA's Environmental Liability Language**

The specific issue is whether GenCorp retained liability for Textileather's costs related to closing the RCRA units entitling Textileather to indemnification. The APA addresses this issue. Section 9.1 of the APA, labeled "Environmental Liabilities," describes which party retains particular liabilities.

Specifically, Section 9.1.1[2] describes those environmental liabilities retained by GenCorp. It states in part: "[GenCorp] will retain responsibility for all liabilities, if any, to third persons in respect of the substances, conditions and other matters which are included on the Chemicals List in Section

---

[2]

9.1.1 <u>Retained Liabilities.</u> Seller will retain responsibility for:
    (a) all liabilities, if any, to third persons in respect of the substances, conditions and other matters which are included on the Chemicals List in Section 9.1.6, . . . whenever such liabilities may arise, and by whatever third persons may assert such liabilities, specifically including (A) fines, penalties, judgments, awards, settlements, losses, damages, costs, fees (including attorneys' and consultants' fees), expenses and disbursements, (B) defense and other responses to any administrative or judicial action (including claims, notice letters, complaints and other assertions of liability) instituted by any third person concerning any such liability, and (C) financial responsibility for (i) cleanup costs and injunctive relief, including any removal, remedial or other response actions, and natural resource damages, and (ii) any other compliance or remedial measures. . . . and
    (b) all liabilities, if any, to third persons (including the types of liabilities identified in (a)(A)-(C) above) in respect of any substance, condition or other matter related to the off-site management (including handling, storage, treatment, recycling, transportation or disposal) of any material after June 14, 1954 and prior to the Closing at any off-site property.

9.1.6, . . . whenever such liabilities may arise, and by whatever third persons may assert such liabilities." Section 9.1.1 then describes examples of retained liabilities covered by this language.

Section 9.1.2 further lists specific liabilities retained by GenCorp, only one which is relevant to the current dispute. That one is found in Section 9.1.2(c) and states in part: "[s]ubject to the limit of $250,000, Seller will pay for the costs of performing those activities which are necessary to obtain the Part B RCRA permit described in Seller's prospectus."

Section 9.1.3 states that Textileather "will assume [GenCorp's] liabilities in respect of any substances or environmental conditions relating to the Business except those retained by [GenCorp] as provided in Sections 9.1.1 or 9.1.2."

Section 9.1.4[3] sets forth the circumstances under which GenCorp is to defend and indemnify Textileather. GenCorp's indemnification responsibility is limited to liabilities retained by GenCorp in Sections 9.1.1 and 9.1.2. Indemnification therefore turns on whether GenCorp retained a specific liability under Sections 9.1.1 and 9.1.2.

**Indemnification Requires a Third-Party Action**

Textileather seeks to recover costs incurred in attempting to fulfill its regulatory obligation to close the RCRA units. Once Textileather decided to stop operating the RCRA units, Textileather was required to obtain OEPA approval. *See* Ohio Admin. Code § 3745-66-13.

---

[3]

9.1.4 <u>Indemnification</u>. Seller will indemnify and defend Purchaser with respect to the liabilities retained by Seller as provided in Sections 9.1.1 and 9.1.2 above; provided that Purchaser promptly gives Seller notice of any claims or actions, transmits to Seller copies of all documents and papers received by or served on Purchaser in connection therewith, permits Seller to control the defense thereof, and (at its own expense) fully cooperates with Seller in the defense thereof. Purchaser will indemnify and defend Seller with respect to the liabilities assumed by Purchaser as provided in 9.1.3 above; provided that Seller promptly gives Purchaser notice of any claims or actions, transmits to Seller copies of all documents and papers received by or served on Seller in connection therewith, permits Purchaser to control the defense thereof, and (at its own expense) fully cooperates with Purchaser in the defense thereof.

Whether the OEPA "administrative action" related to the closure plan falls within the APA requirements for indemnification depends on whether it is a "claim or action" under Section 9.1.4. The APA does not define the terms "claim" or "action," so this Court will apply their ordinary meaning. *Foster Wheeler Enviresponse*, 100 Ohio St. 3d at 361 ("Common words . . . will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."). Textileather claims the closure plan is an "action" under Section 9.1.4, not a "claim" (TR 11), citing the OEPA's Notice of Deficiency which describes the dispute over the closure plan as an "action" (TR 17-18). But OEPA's label, by itself, does not end the inquiry. Even assuming the dispute with the OEPA is an "action," indemnification requires the dispute be brought by a third-party.

The negotiations and resulting litigation between Textileather and the OEPA was a "pure regulatory proceeding" (TR 13) that does not fit within either Section 9.1.1 or Section 9.1.4. This regulatory obligation was neither a third-party claim nor third-party action against Textileather. There was no demand for liability by a third-party. There was no claim that Textileather's conduct caused a third-party to suffer damage. Rather, Textileather had a regulatory obligation to submit a closure plan that met OEPA's approval. Textileather's disagreement with the terms of the OEPA plan does not make the regulatory give-and-take a "claim or action" *by* the OEPA.

Simply put, even if the OEPA dispute could be characterized as a claim or action, it would not meet Section 9.1.1's third-party requirement. The APA provides for indemnity only when a claim or action is brought against Textileather by a third-party or when Textileather incurs liability to a third-party. Section 9.1.1 unambiguously limits GenCorp's retained liabilities "to third persons." The specific descriptions of liability which follow in Section 9.1.1 are examples that meet this third-party requirement and the RCRA closure falls outside this clear and unambiguous language.

Textileather argues the above interpretation renders portions of the APA meaningless, citing 9.1.1(a)(C)(ii) ("specifically including . . . financial responsibility for . . . any other compliance or remedial measures") as language inconsistent with a requirement that retained liabilities be limited to third-parties (TR 15). This Court disagrees. This interpretation is consistent with the APA as a whole. Section 9.1.1(a)(C)(ii) describes an *example* of GenCorp's retained liability and, like all examples in Section 9.1.1, is modified by the language that limited GenCorp's liabilities "to third persons, . . . whenever such liabilities may arise, and by whatever third persons may assert such liabilities." Requiring retained liabilities to be third-party liabilities is thus entirely consistent with not only Section 9.1.1(a)(C)(ii), but the APA as a whole.

The parties cannot provide (TR 18-21), nor has the Court found, any case holding that a regulatory obligation incurred by a party's own business decision is the same as a third-party claim or action. At the hearing, GenCorp provided an appropriate example of when it would retain liability: namely, where there is contamination that the OEPA demands Textileather clean up, but Textileather refuses, and the OEPA then hires a contractor to come in and do the clean-up. In this situation, the OEPA would be a "third person" contemplated by the APA who may attempt to sue Textileather to recover its costs. Provided the other provisions of the APA were met, GenCorp retained this type of liability (TR 13).

Textileather cites *Anderson Dev. Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1134 (6th Cir. 1995) ("Although [plaintiff] cooperated voluntarily, it was under a government mandate to conduct the environmental clean-up. Thus . . . there was indeed liability to a third party -- the EPA."), as support that the costs to battle the OEPA in this case make the OEPA a third-party (TR 20-21). But *Anderson* interpreted Michigan insurance law, and involved costs related to a "potentially responsible party" where the court found that the government had already imposed liability on the insured. Here,

8

no such liability was imposed on Textileather by OEPA. Rather, Textileather seeks to recover administrative-type costs of negotiating, and then litigating, the terms of a closure plan for the RCRA units. Textileather's business decision to shut down the RCRA units necessarily meant it would be required to negotiate and comply with a closure plan. There is no third-party claim to trigger indemnity; instead, Textileather seeks *first*-party costs.

### Payment of $150,000

While GenCorp did not plead, and therefore waived, the affirmative defenses of release and accord and satisfaction, a later amendment to the APA further supports that GenCorp is not liable for closure costs. Section 9.1.2(c) originally required GenCorp to pay Textileather up to $250,000 to aid with the process of obtaining a permit to continue operating the RCRA units. Instead of pursuing the Part B permit, Textileather chose to close the units, negating the need to acquire the permit. Under the plain language of the original APA, once Textileather stopped pursuing the RCRA permit, GenCorp was relieved of paying any further costs under Section 9.1.2(c) (GenCorp "pay[s] for the costs of . . . those activities . . . necessary to obtain the Part B RCRA permit"). But in June 1992, GenCorp and Textileather amended the APA. Textileather now agreed to accept GenCorp's lump sum payment of $150,000 as a substitute for GenCorp's obligation to help renew the RCRA permit (Doc. No. 75, Ex. 4, 6/4/1992 APA Amendment). The Amendment, which occurred while Textileather was negotiating with the OEPA, states:

> In lieu of and in substitution for GenCorp's obligation described in Section 9.1.2(c) of the Agreement, GenCorp will pay to Textileather $150,000 within fourteen (14) days of the execution of this letter agreement.

Plaintiff argues there is no significance to this payment or amendment (TR 22-23). But this "side deal" is consistent with neither party having contemplated GenCorp would assume closure costs. Had the parties intended GenCorp to assume any portion of the closure costs, the APA would have

9

included language similar to that found in Section 9.1.2(c), which shifted the first $250,000 of permit costs to GenCorp.  There is no such similar cost-shifting language for closing the RCRA units and not pursuing the permit.  Closure of the RCRA units and the attendant costs were contingencies "that might have been foreseen and specifically provided for in the contract but [were] not."  *Porter v. Columbus Bd. of Indus. Relations*, 111 Ohio App. 3d 238, 242-43 (1996).  The Court cannot read language or terms into a contract which the parties omitted.  *See id.*  Clearly, closure costs were not anticipated, let alone intended to be retained by GenCorp, and therefore GenCorp cannot be held responsible for them.

## CERCLA CLAIMS

Textileather's claims under CERCLA also fail.  Parties may contractually shift CERCLA liability or other environmental liabilities among themselves through an assumption or indemnity agreement.  *Olin Corp. v. Yeargin Inc.*, 146 F.3d 398, 407 (6th Cir. 1998).  Whether a particular agreement has shifted such liabilities is a question of state law.  *Id.*  The Sixth Circuit upheld a transfer of liability under Ohio law where the agreement is "either specific enough to include CERCLA liability or general enough to include all environmental liability."  *White Consol. Indus., Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403, 409-10 (6th Cir. 1999).  At least one other district court in Ohio has adopted this test.  *See Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F. Supp. 2d 644, 656-57 (S.D. Ohio 2002).

The contractual language in *White* provided that the plaintiff assumed "all obligations and liabilities of the Business, contingent, or otherwise."  *White Consol. Indus. Inc.*, 179 F.3d at 410.  The court held this language to be "general enough to include all environmental liability."  *Id.*  By contrast, the language in *Cytec* provided, in the context of a dissolution, the previous owner "will distribute, subject to its liabilities, all of its property and assets of every kind, including its goodwill

10

and business as a going concern" to the defendant. *Cytec Indus., Inc.*, 196 F. Supp. 2d at 656. The court found this language, specifically the phrase "subject to its liabilities," to be neither specific enough to include CERCLA liability nor general enough to include all environmental liability. *Id.*

Here, the APA is general enough to include all environmental liability and to meet the test set forth in *White*. The language in Section 9.1.3 states that Textileather assumes *all* liabilities relating to the business not specifically retained by GenCorp. This is similar to the language in *White*. In combination with Sections 9.1.1 and 9.1.2, which provide for GenCorp assuming certain environmental liabilities, all environmental liability relating to the business has been allocated between the parties, leaving nothing to the imagination or to CERCLA. GenCorp's counsel colorfully describes the combination of these Sections -- "an as-is clause on steroids" (TR 33-34) -- such that liability after the Closing belongs either to GenCorp or to Textileather by operation of these three Sections. This comprehensive approach to dividing liabilities is "general enough to include all environmental liability." *White*, 179 F.3d at 409-10.

## CONCLUSION

For the foregoing reasons, GenCorp's Motion is granted, and Textileather's Motion is denied.

IT IS SO ORDERED.

                                              s/ *Jack Zouhary*
                                              JACK ZOUHARY
                                              U. S. DISTRICT JUDGE

May 5, 2010